STEVEN A. GIBSON
Nevada Bar No. 6656
sgibson@dickinsonwright.com
JONATHAN M. A. SALLS
Nevada Bar No. 12085
jsalls@dickinsonwright.com

### DICKINSON WRIGHT PLLC
City Center West
7201 West Lake Mead Boulevard, Suite 503
Las Vegas, Nevada 89128
Telephone 702.541.7888
Facsimile 702.541.7899

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| AMC FABRICATION, INC., a Nevada corporation,<br><br>          Plaintiff,<br>     v.<br><br>KRD TRUCKING WEST, INC., a Nevada corporation; K. R. DRENTH TRUCKING, INC., an Illinois corporation; KENNETH S. DRENTH, an individual; and THOMAS J. MANZKE, an individual,<br><br>          Defendants. | Case No.:  2:12-cv-00146<br><br>**COMPLAINT**<br><br>**(JURY TRIAL REQUESTED)** |

Plaintiff, AMC Fabrication, Inc. ("AMC"), by and through its counsel, Dickinson Wright PLLC, complains and alleges as follows against Defendants KRD Trucking West, Inc. ("KRD Trucking"), K. R. Drenth Trucking, Inc. ("Drenth Trucking"), Kenneth S. Drenth ("Mr. Drenth"), and Thomas J. Manzke ("Mr. Manzke") (collectively "Defendants"), on information and belief, that the following are and have been true at all time relevant to this lawsuit unless otherwise indicated specifically to the contrary:

## NATURE OF ACTION

1.     This is an action for direct copyright infringement under 17 U.S.C. § 501, vicarious and contributory copyright infringement, direct and contributory misappropriation of

commercial property under Nevada common law, intentional misrepresentation, fraud in the inducement, fraudulent concealment, negligent misrepresentation, civil conspiracy, aiding and abetting, breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment under Nevada common law, and promissory estoppel.

**PARTIES**

2.      AMC is a Nevada corporation with its principal place of business in Nevada.

3.      KRD Trucking is a Nevada corporation with its principal place of business in Nevada.

4.      Drenth Trucking is an Illinois corporation with its principal place of business in Illinois.

5.      KRD Trucking is a subsidiary of Drenth Trucking.

6.      KRD Trucking is an affiliate of Drenth Trucking.

7.      Mr. Drenth is an Illinois resident.

8.      Mr. Drenth is an officer of KRD Trucking.

9.      Mr. Drenth was an owner of KRD Trucking.

10.      Mr. Drenth was an officer of Drenth Trucking.

11.      Mr. Drenth was an owner of Drenth Trucking.

12.      Mr. Manzke is an Illinois resident.

13.      Mr. Manzke is an officer of KRD Trucking.

14.      Mr. Manzke was an owner of KRD Trucking.

15.      Mr. Manzke is an officer of Drenth Trucking.

16.      Mr. Manzke was an owner of Drenth Trucking.

**JURISDICTION**

17.      AMC incorporates, repeats, and realleges every allegation set forth above.

18.      This Court has original jurisdiction over Plaintiffs' First through Third Causes of Action (inclusive) (the "Federal Law Causes of Action"), pursuant to 28 U.S.C. § 1338 because the Federal Law Causes of Action arise under the copyright laws of the United States.

19.     This Court has supplemental jurisdiction over Plaintiffs' Fourth through Fifteenth Causes of Action (inclusive) (the "State Law Causes of Action") pursuant to 28 U.S.C. § 1367 because the State Law Causes of Action are so related to the Federal Law Causes of Action as to form part of the same case or controversy as the Federal Law Causes of Action pursuant to Article III of the United States Constitution.

20.     KRD Trucking resides in Nevada.

21.     Drenth Trucking is registered to do business in the state of Nevada.

22.     Drenth Trucking has purposefully directed its activities toward the state of Nevada.

23.     Drenth Trucking specifically requested delivery of goods from AMC to Illinois.

24.     KRD Trucking engaged in interactions with AMC directly for the benefit of Drenth Trucking.

25.     Mr. Drenth has purposefully directed his activities toward the state of Nevada.

26.     Mr. Drenth has been physically present in the state of Nevada while conducting business activities.

27.     Mr. Manzke has purposefully directed his activities toward the state of Nevada.

28.     Mr. Manzke has been physically present in the state of Nevada while conducting business activities.

## **VENUE**

29.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this judicial district.

30.     KRD Trucking and Drenth Trucking reside in this judicial district under 28 U.S.C. § 1391(c) because KRD Trucking and Drenth Trucking are subject to personal jurisdiction in this judicial district.

31.     Venue is proper in this judicial district, in relation to Defendants, under 28 U.S.C. § 1391(b)(3) because KRD Trucking and Drenth Trucking are found in this judicial district and there is no other judicial district in which the action may otherwise be brought.

**FACTS**

32.     Drenth Trucking is in the business of providing hauling services to waste-retrieval and disposal companies located in the United States of America.

33.     KRD Trucking is in the business of providing hauling services to waste-retrieval and disposal companies located in Nevada ("KRD Hauling Services").

34.     KRD Trucking had a relationship with Republic Services, Inc., a Delaware corporation ("Republic"), whereby KRD Trucking provided KRD Hauling Services for the benefit of Republic.

35.     Drenth Trucking purchased waste-hauling trailers ("Trailers") from East Manufacturing Corporation, a Delaware corporation ("East").

36.     KRD Trucking purchased Trailers from East.

37.     In or about winter 2006, KRD Trucking utilized approximately twenty-five (25) Trailers, which were each originally equipped with an automatically-functioning tarp capability (the "Auto-Tarp Trailers"), for KRD Hauling Services.

38.     In or about winter 2006, KRD Trucking engaged AMC, on a compensated basis, to make various repairs to the trailer aspect of the Auto-Tarp Trailers.

39.     In or about winter 2006, AMC made repairs to the trailer aspect of the Auto-Tarp Trailers.

40.     At the time AMC made repairs to the trailer aspect of the Auto-Tarp Trailers, AMC observed that the Auto-Tarp Trailers were manufactured by East by viewing the East name affixed to the Auto-Tarp Trailers.

41.     In or about winter 2006, KRD Trucking and Drenth Trucking offered to pay AMC to engineer, develop, fabricate, and manufacture a manually-functioning tarp capability for, on the low-end, collectively, two hundred fifty (250) of KRD Trucking's Trailers and Drenth Trucking's Trailers (the "Offer").

42.     Mr. Drenth was a natural person who communicated the Offer to AMC.

43.     Mr. Manzke was present at the time of the Offer and reaffirmed the Offer to AMC.

44.     Prior to AMC's acceptance of the Offer, KRD Trucking represented to AMC, in order to induce AMC to accept the Offer, that KRD Trucking would use KRD Trucking's efforts to influence East to also purchase manual-tarps from AMC (the "KRD East Representation").

45.     Prior to AMC's acceptance of the Offer, Drenth Trucking represented to AMC, in order to induce AMC to accept the Offer, that Drenth Trucking would use Drenth Trucking's efforts to influence East to also purchase manual-tarps from AMC (the "DT East Representation").

46.     Prior to AMC's acceptance of the Offer, Mr. Drenth represented to AMC, in order to induce AMC to accept the Offer, that Mr. Drenth would use Mr. Drenth's efforts to influence East to also purchase manual-tarps from AMC (the "Drenth East Representation").

47.     Prior to AMC's acceptance of the Offer, Mr. Manzke represented to AMC, in order to induce AMC to accept the Offer, that Mr. Manzke would use Mr. Manzke's efforts to influence East to also purchase manual-tarps from AMC (the "Manzke East Representation").

48.     Prior to the KRD East Representation, the DT East Representation, the Drenth East Representation, and the Manzke East Representation (collectively known herein as the "East Reliance Representations"), KRD Trucking made known to AMC that KRD Trucking's Trailers were purchased from East.

49.     Prior to the East Reliance Representations, Drenth Trucking made known to AMC that Drenth Trucking's Trailers were purchased from East.

50.     Prior to the East Reliance Representations, Mr. Drenth made known to AMC that KRD Trucking's Trailers and Drenth Trucking's Trailers (collectively the "KRD-Related Trailers") were purchased from East.

51.     Prior to the East Reliance Representations, Mr. Manzke made known to AMC that the KRD-Related Trailers were purchased from East.

52.     Prior to AMC's acceptance of the Offer, KRD Trucking introduced AMC to East.

53.     Prior to AMC's acceptance of the Offer, Drenth Trucking introduced AMC to East.

54.     Prior to AMC's acceptance of the Offer, Mr. Drenth introduced AMC to East (the "Drenth East Introduction").

55.     At the same time as the Drenth East Introduction, Mr. Manzke joined Mr. Drenth in the Drenth East Introduction.

56.     Contemporaneous with the East Reliance Representations, KRD Trucking represented to AMC that if AMC accepted the Offer, East would engage AMC to produce manual-tarps, above and beyond the amount associated with the Offer, for East's Trailers (the "KRD East Interest Representation").

57.     Contemporaneous with the East Reliance Representations, Drenth Trucking represented to AMC that if AMC accepted the Offer, East would engage AMC to produce manual-tarps, above and beyond the amount associated with the Offer, for East's Trailers (the "DT East Interest Representation").

58.     Contemporaneous with the East Reliance Representations, Mr. Drenth represented to AMC that if AMC accepted the Offer, East would engage AMC to produce manual-tarps, above and beyond the amount associated with the Offer, for East's Trailers (the "Drenth East Interest Representation").

59.     Contemporaneous with the East Reliance Representations, Mr. Manzke represented to AMC that if AMC accepted the Offer, East would engage AMC to produce manual-tarps, above and beyond the amount associated with the Offer, for East's Trailers (the "Manzke East Interest Representation").

60.     The KRD East Interest Representation, the DT East Interest Representation, the Drenth East Interest Representation, and the Manzke East Interest Representation (collectively known herein as the "East Misrepresentations") were false.

61.     Prior to AMC's acceptance of the Offer, AMC made clear to KRD Trucking that AMC would need to purchase substantial and expensive equipment, machinery, and tooling systems in order to adequately perform AMC's anticipated obligations in relation to the Offer (the "Initial Machinery").

62.     Prior to AMC's acceptance of the Offer, AMC made clear to Drenth Trucking that AMC would need to purchase the Initial Machinery.

63.     Prior to AMC's acceptance of the Offer, AMC made clear to Mr. Drenth that AMC would need to purchase the Initial Machinery.

64.     Prior to AMC's acceptance of the Offer, AMC made clear to Mr. Manzke that AMC would need to purchase the Initial Machinery.

65.     In or about winter 2006, AMC accepted the Offer (the Offer and said acceptance known herein as the "Contract").

66.     AMC communicated the acceptance of the Offer to Mr. Drenth.

67.     Mr. Manzke was present at the time of AMC's acceptance of the Offer and joined Mr. Drenth in reception of that acceptance.

68.     Contemporaneous with AMC's acceptance of the Offer, AMC notified KRD Trucking and Drenth Trucking that KRD Trucking's and Drenth Trucking's price for the provision of manual-tarps in association with the Contract would be three thousand four hundred seventy-five dollars ($3,475.00) per Trailer (the "Per Trailer Price").

69.     Contemporaneous with AMC's acceptance of the Offer, AMC notified Mr. Drenth that KRD Trucking's and Drenth Trucking's price for the provision of manual-tarps in association with the Contract would be the Per Trailer Price.

70.     Contemporaneous with AMC's acceptance of the Offer, AMC notified Mr. Manzke that KRD Trucking's and Drenth Trucking's price for the provision of manual-tarps in association with the Contract would be the Per Trailer Price.

71.     Contemporaneous with AMC's acceptance of the Offer, KRD Trucking informed AMC that KRD Trucking also intended to substantially increase the number of KRD Trucking's Trailers, which would increase the number of manual-tarps purchased in relation to the Contract (the "KRD Fleet Representation").

72.     Contemporaneous with AMC's acceptance of the Offer, Drenth Trucking informed AMC that Drenth Trucking also intended to substantially increase the number of

Drenth Trucking's Trailers, which would increase the number of manual-tarps purchased in relation to the Contract (the "DT Fleet Representation").

73.     Contemporaneous with AMC's acceptance of the Offer, Mr. Drenth informed AMC that KRD Trucking and Drenth Trucking also intended to substantially increase the number of the KRD-Related Trailers, which would increase the number of manual-tarps purchased in relation to the Contract (the "Drenth Fleet Representation").

74.     Contemporaneous with AMC's acceptance of the Offer, Mr. Manzke informed AMC that KRD Trucking and Drenth Trucking also intended to substantially increase the number of the KRD-Related Trailers, which would increase the number of manual-tarps purchased in relation to the Contract (the "Manzke Fleet Representation").

75.     The KRD Fleet Representation, the DT Fleet Representation, the Drenth Fleet Representation, and the Manzke Fleet Representation (collectively known herein as the "Fleet Expansion Misrepresentations") were false.

76.     When making the Offer, KRD Trucking lacked the intent to adequately perform KRD Trucking's obligations in relation to the Contract (the "KRD Inducement Representation").

77.     When making the Offer, Drenth Trucking lacked the intent to adequately perform Drenth Trucking's obligations in relation to the Contract (the "DT Inducement Representation").

78.     When communicating the Offer, Mr. Drenth lacked the intent for KRD Trucking and Drenth Trucking to adequately perform KRD Trucking's and Drenth Trucking's obligations in relation to the Contract (the "Drenth Inducement Representation").

79.     When reaffirming the Offer, Mr. Manzke lacked the intent for KRD Trucking and Drenth Trucking to adequately perform KRD Trucking's and Drenth Trucking's obligations in relation to the Contract (the "Manzke Inducement Representation").

80.     Contemporaneous with AMC's acceptance of the Offer, AMC was unaware of the KRD Inducement Representation, the DT Inducement Representation, the Drenth Inducement Representation, and the Manzke Inducement Representation (collectively known herein as the "Inducement Misrepresentations").

81.     Shortly after AMC's acceptance of the Offer, AMC purchased the Initial Machinery.

82.     Shortly after AMC's acceptance of the Offer, AMC made clear to KRD Trucking that AMC would need to purchase additional equipment, machinery, and tooling systems in order to meet the timing demands associated with the Contract (the "Additional Machinery").

83.     Shortly after AMC's acceptance of the Offer, AMC made clear to Drenth Trucking that AMC would need to purchase the Additional Machinery.

84.     Shortly after AMC's acceptance of the Offer, AMC made clear to Mr. Drenth that AMC would need to purchase the Additional Machinery.

85.     Shortly after AMC's acceptance of the Offer, AMC made clear to Mr. Manzke that AMC would need to purchase the Additional Machinery.

86.     Shortly after AMC's acceptance of the Offer, AMC purchased the Additional Machinery.

87.     AMC spent over two hundred thousand dollars ($200,000.00) to purchase the Initial Machinery and the Additional Machinery.

88.     AMC relied on the East Misrepresentations, the Fleet Expansion Misrepresentations, and the Inducement Misrepresentations (collectively known herein as the "Pre-Contract Misrepresentations") to incur the costs of purchasing the Initial Machinery and the Additional Machinery.

89.     AMC required several months to complete the engineering, development, and fabrication associated with the Contract (the "Initial Production Process").

90.     Contemporaneous with AMC's acceptance of the Offer, AMC made clear to KRD Trucking of the time necessary in relation to the Initial Production Process.

91.     Contemporaneous with AMC's acceptance of the Offer, AMC made clear to Drenth Trucking of the time necessary in relation to the Initial Production Process.

92.     Contemporaneous with AMC's acceptance of the Offer, AMC made clear to Mr. Drenth of the time necessary in relation to the Initial Production Process.

93.     Contemporaneous with AMC's acceptance of the Offer, AMC made clear to Mr. Manzke of the time necessary in relation to the Initial Production Process.

94.     During the Initial Production Process, KRD Trucking performed evaluations in relation to the Initial Production Process (the "KRD Evaluation").

95.     During the Initial Production Process, Drenth Trucking performed evaluations in relation to the Initial Production Process (the "DT Evaluation").

96.     During the Initial Production Process, Mr. Drenth performed evaluations in relation to the Initial Production Process (the "Drenth Evaluation").

97.     During the Initial Production Process, Mr. Manzke performed evaluations in relation to the Initial Production Process (the "Manzke Evaluation").

98.     During the Initial Production Process, KRD Trucking pressured AMC to complete the work associated with the Contract as soon as possible.

99.     During the Initial Production Process, Drenth Trucking pressured AMC to complete the work associated with the Contract as soon as possible.

100.     During the Initial Production Process, Mr. Drenth pressured AMC to complete the work associated with the Contract as soon as possible.

101.     During the Initial Production Process, Mr. Manzke pressured AMC to complete the work associated with the Contract as soon as possible.

102.     About the time of the Fleet Expansion Misrepresentations, KRD Trucking induced AMC to decrease the price for each purchase of a manual-tarp, as a result of the increased number of manual-tarps to be purchased in association with the Fleet Expansion Misrepresentations.

103.     About the time of the Fleet Expansion Misrepresentations, Drenth Trucking induced AMC to decrease the price for each purchase of a manual-tarp, as a result of the increased number of manual-tarps to be purchased in association with the Fleet Expansion Misrepresentations.

104.     About the time of the Fleet Expansion Misrepresentations, Mr. Drenth induced AMC to decrease the price for each purchase of a manual-tarp, as a result of the increased

number of manual-tarps to be purchased in association with the Fleet Expansion Misrepresentations.

105.    About the time of the Fleet Expansion Misrepresentations, Mr. Manzke induced AMC to decrease the price for each purchase of a manual-tarp, as a result of the increased number of manual-tarps to be purchased in association with the Fleet Expansion Misrepresentations.

106.    AMC relied on the Fleet Expansion Misrepresentations to decrease the price of each purchase of the manual-tarps, in relation to the Contract, for KRD Trucking.

107.    AMC relied on the Fleet Expansion Misrepresentations to decrease the price of each purchase of the manual-tarps, in relation to the Contract, for Drenth Trucking.

108.    In or about April 2007, and after the KRD Evaluation, KRD Trucking informed AMC that KRD Trucking approved the manual-tarp product as delivered by AMC (the "Manual-Tarp Product") in relation to the Contract (the "KRD Approval").

109.    In or about April 2007, and after the DT Evaluation, Drenth Trucking informed AMC that Drenth Trucking approved the Manual-Tarp Product in relation to the Contract (the "DT Approval").

110.    In or about April 2007, and after the Drenth Evaluation, Mr. Drenth informed AMC that Mr. Drenth approved the Manual-Tarp Product in relation to the Contract (the "Drenth Approval").

111.    In or about April 2007, and after the Manzke Evaluation, Mr. Manzke informed AMC that Mr. Manzke approved the Manual-Tarp Product in relation to the Contract (the "Manzke Approval").

112.    AMC created work product that arose out of the engineering, development, and fabrication associated with the Manual-Tarp Product, in whole and in part, including, without limitation, replacement parts (the "AMC Work Product").

113.    AMC is the owner of the AMC Work Product.

114.    On or about June 23, 2011, AMC applied for registration of original works of authorship associated with the AMC Work Product with the United States Copyright Office (the "Copyrighted Works").

115.    AMC is the owner of copyrights associated with the Copyrighted Works.

116.    On or about April 16, 2007, KRD Trucking and Drenth Trucking, collectively, requested prompt delivery of only eleven (11) Manual-Tarp Products to be sent to facilities in Las Vegas for approximately two thousand fifty dollars ($2,050.00) per Manual-Tarp Product.

117.    In or about April 2007, and despite the KRD Approval, KRD Trucking informed AMC that KRD Trucking was not able to request delivery of the remaining two hundred fifty (250) Manual-Tarp Products because KRD Trucking needed additional time to evaluate the Manual-Tarp Product.

118.    In or about April 2007, and despite the DT Approval, Drenth Trucking informed AMC that Drenth Trucking was not able to request delivery of the remaining two hundred fifty (250) Manual-Tarp Products because Drenth Trucking needed additional time to evaluate the Manual-Tarp Product.

119.    In or about April 2007, and despite the Drenth Approval, Mr. Drenth informed AMC that KRD Trucking and Drenth Trucking were not able to request delivery of the remaining two hundred fifty (250) Manual-Tarp Products because KRD Trucking and Drenth Trucking needed additional time to evaluate the Manual-Tarp Product.

120.    In or about April 2007, and despite the Manzke Approval, Mr. Manzke informed AMC that KRD Trucking and Drenth Trucking were not able to request delivery of the remaining two hundred fifty (250) Manual-Tarp Products because KRD Trucking and Drenth Trucking needed additional time to evaluate the Manual-Tarp Product.

121.    In or about July 2007, KRD Trucking requested that AMC provide the Copyrighted Works to KRD Trucking in order for KRD Trucking to comply with purported regulations (the "KRD Regulatory Representation").

122.   In or about July 2007, Drenth Trucking requested that AMC provide the Copyrighted Works to Drenth Trucking in order for Drenth Trucking to comply with purported regulations (the "DT Regulatory Representation").

123.   In or about July 2007, Mr. Drenth requested that AMC provide the Copyrighted Works to KRD Trucking and Drenth Trucking in order for KRD Trucking and Drenth Trucking to comply with purported regulations (the "Drenth Regulatory Representation").

124.   In or about July 2007, Mr. Manzke requested that AMC provide the Copyrighted Works to KRD Trucking and Drenth Trucking in order for KRD Trucking and Drenth Trucking to comply with purported regulations (the "Manzke Regulatory Representation").

125.   The KRD Regulatory Representation, the DT Regulatory Representation, the Drenth Regulatory Representation, and the Manzke Regulatory Representation (collectively known herein as the "Regulation Misrepresentations") were false.

126.   In or about July 2007, AMC provided the Copyrighted Works to KRD Trucking.

127.   In or about July 2007, AMC provided the Copyrighted Works to Drenth Trucking.

128.   KRD Trucking never returned the Copyrighted Works to AMC.

129.   Drenth Trucking never returned the Copyrighted Works to AMC.

130.   KRD Trucking intended to use the Copyrighted Works for itself to manufacture a manual-tarp product effectively the same in form and substance as the Manual-Tarp Product (the "Infringing Manual-Tarp Product") without authorization from AMC.

131.   Drenth Trucking intended to use the Copyrighted Works for itself to manufacture the Infringing Manual-Tarp Product without authorization from AMC.

132.   Mr. Drenth intended for KRD Trucking and Drenth Trucking to use the Copyrighted Works for themselves to manufacture the Infringing Manual-Tarp Product without authorization from AMC.

133.   Mr. Manzke intended for KRD Trucking and Drenth Trucking to use the Copyrighted Works for themselves to manufacture the Infringing Manual-Tarp Product without authorization from AMC.

134.    On or about June 21, 2007, KRD Trucking and Drenth Trucking, collectively, requested prompt delivery of only four (4) Manual-Tarp Products to be sent directly to Drenth Trucking's facilities in Illinois for approximately two thousand two hundred dollars ($2,200.00) per Manual-Tarp Product.

135.    On or about June 28, 2007, KRD Trucking and Drenth Trucking, collectively, requested prompt delivery of only twenty (20) Manual-Tarp Products to be sent directly to East's facilities for East to install on the KRD-Related Trailers for approximately two thousand two hundred dollars ($2,200.00) per Manual-Tarp Product.

136.    In or about summer 2007, KRD Trucking directed AMC to make some deliveries of the Manual-Tarp Products directly to East's facilities (the "KRD Delivery Representation").

137.    In or about summer 2007, Drenth Trucking directed AMC to make some deliveries of the Manual-Tarp Products directly to East's facilities (the "DT Delivery Representation").

138.    In or about summer 2007, Mr. Drenth directed AMC to make some deliveries of the Manual-Tarp Products directly to East's facilities (the "Drenth Delivery Representation").

139.    In or about summer 2007, Mr. Manzke directed AMC to make some deliveries of the Manual-Tarp Products directly to East's facilities (the "Manzke Delivery Representation").

140.    In or about summer 2007, AMC sent the Manual-Tarp Products to East in reliance upon the KRD Delivery Representation.

141.    In or about summer 2007, AMC sent the Manual-Tarp Products to East in reliance upon the DT Delivery Representation.

142.    In or about summer 2007, AMC sent the Manual-Tarp Products to East in reliance upon the Drenth Delivery Representation.

143.    In or about summer 2007, AMC sent the Manual-Tarp Products to East in reliance upon the Manzke Delivery Representation.

144.    On or about July 23, 2007, KRD Trucking and Drenth Trucking, collectively, requested prompt delivery of only two (2) Manual-Tarp Products to be sent directly to East's

facilities for East to install on the KRD-Related Trailers for approximately two thousand fifty dollars ($2,050.00) per Manual-Tarp Product.

145.     On or about August 20, 2007, KRD Trucking and Drenth Trucking, collectively, requested prompt delivery of only two (2) Manual-Tarp Products to be sent directly to Drenth Trucking's facilities in Illinois for approximately one thousand six hundred eighty dollars ($1,680.00) per Manual-Tarp Product.

146.     On or about August 24, 2007, KRD Trucking and Drenth Trucking, collectively, requested prompt delivery of only twenty (20) Manual-Tarp Products to be sent directly to East's facilities for East to install on the KRD-Related Trailers for approximately two thousand two hundred dollars ($2,200.00) per Manual-Tarp Product.

147.     In or about early 2008, KRD Trucking continued to delay KRD Trucking's performance under the Contract by reassuring AMC that KRD Trucking would request delivery of what remained to be ordered of the two hundred fifty (250) Manual-Tarp Products in the near future (the "KRD Substantial Representation").

148.     In or about early 2008, Drenth Trucking continued to delay Drenth Trucking's performance under the Contract by reassuring AMC that Drenth Trucking would request delivery of what remained to be ordered of the two hundred fifty (250) Manual-Tarp Products in the near future (the "DT Substantial Representation").

149.     In or about early 2008, Mr. Drenth continued to delay KRD Trucking's and Drenth Trucking's performance under the Contract by reassuring AMC that KRD Trucking and Drenth Trucking would request delivery of what remained to be ordered of the two hundred fifty (250) Manual-Tarp Products in the near future (the "Drenth Substantial Representation").

150.     In or about early 2008, Mr. Manzke continued to delay KRD Trucking's and Drenth Trucking's performance under the Contract by reassuring AMC that KRD Trucking and Drenth Trucking would request delivery of what remained to be ordered of the two hundred fifty (250) Manual-Tarp Products in the near future (the "Manzke Substantial Representation").

151.    The KRD Substantial Representation, the DT Substantial Representation, the Drenth Substantial Representation, and the Manzke Substantial Representation (collectively known herein as the "Substantial Order Misrepresentations") were false.

152.    In or about early 2008, KRD Trucking informed AMC of Drenth Trucking's acquisition of Trailers in Florida, which would increase the number of the Manual-Tarp Products purchased (the "KRD Florida Representation").

153.    In or about early 2008, Drenth Trucking informed AMC of Drenth Trucking's acquisition of Trailers in Florida, which would increase the number of the Manual-Tarp Products purchased (the "DT Florida Representation").

154.    In or about early 2008, Mr. Drenth informed AMC of Drenth Trucking's acquisition of Trailers in Florida, which would increase the number of the Manual-Tarp Products purchased (the "Drenth Florida Representation").

155.    In or about early 2008, Mr. Manzke informed AMC of Drenth Trucking's acquisition of Trailers in Florida, which would increase the number of the Manual-Tarp Products purchased (the "Manzke Florida Representation").

156.    The KRD Florida Representation, the DT Florida Representation, the Drenth Florida Representation, and the Manzke Florida Representation (collectively known herein as the "Florida Misrepresentations") were false.

157.    On or about March 24, 2008, KRD Trucking and Drenth Trucking, collectively, requested prompt delivery of only three (3) Manual-Tarp Products to be sent to facilities in Las Vegas for approximately one thousand one hundred thirty dollars ($1,130.00) per Manual-Tarp Product with one Manual-Tarp Product at no cost.

158.    On or about May 30, 2008, KRD Trucking and Drenth Trucking, collectively, requested prompt delivery of only ten (10) Manual-Tarp Products to be sent directly to Drenth Trucking's facilities in Illinois for approximately two thousand four hundred sixty dollars ($2,460.00) per Manual-Tarp Product.

159.    On or about June 23, 2008, KRD Trucking and Drenth Trucking, collectively, requested prompt delivery of only two (2) Manual-Tarp Products to be sent to facilities in Las

Vegas for approximately two thousand two hundred fifty-five dollars ($2,255.00) per Manual-Tarp Product.

160.    At least through July 2008, KRD Trucking reiterated representations to AMC that KRD Trucking and Drenth Trucking would request delivery of what remained to be ordered of the two hundred fifty (250) Manual-Tarp Products in the near future, urging AMC's reliance with respect to such representations (the "KRD Continuous Representation").

161.    At least through July 2008, Drenth Trucking reiterated representations to AMC that KRD Trucking and Drenth Trucking would request delivery of what remained to be ordered of the two hundred fifty (250) Manual-Tarp Products in the near future, urging AMC's reliance with respect to such representations (the "DT Continuous Representation").

162.    At least through July 2008, Mr. Drenth reiterated representations to AMC that KRD Trucking and Drenth Trucking would request delivery of what remained to be ordered of the two hundred fifty (250) Manual-Tarp Products in the near future, urging AMC's reliance with respect to such representations (the "Drenth Continuous Representation").

163.    At least through July 2008, Mr. Manzke reiterated representations to AMC that KRD Trucking and Drenth Trucking would request delivery of what remained to be ordered of the two hundred fifty (250) Manual-Tarp Products in the near future, urging AMC's reliance with respect to such representations (the "Manzke Continuous Representation").

164.    The KRD Continuous Representation, the DT Continuous Representation, the Drenth Continuous Representation, and the Manzke Continuous Representation (collectively known herein as the "Continuous Misrepresentations") were false.

165.    KRD Trucking used the AMC Work Product to manufacture the Infringing Manual-Tarp Product without authorization from AMC.

166.    Drenth Trucking used the AMC Work Product to manufacture the Infringing Manual-Tarp Product without authorization from AMC.

167.    KRD Trucking and Drenth Trucking, under the direction of Mr. Drenth, used the AMC Work Product to manufacture the Infringing Manual-Tarp Product without authorization from AMC.

168.    KRD Trucking and Drenth Trucking, under the direction of Mr. Manzke, used the AMC Work Product to manufacture the Infringing Manual-Tarp Product without authorization from AMC.

169.    KRD Trucking reproduced the Copyrighted Works without authorization from AMC.

170.    Drenth Trucking reproduced the Copyrighted Works without authorization from AMC.

171.    KRD Trucking and Drenth Trucking, either by Mr. Drenth directly or under Mr. Drenth's direction, reproduced the Copyrighted Works without authorization from AMC.

172.    KRD Trucking and Drenth Trucking, either by Mr. Manzke directly or under Mr. Manzke's direction, reproduced the Copyrighted Works without authorization from AMC.

173.    KRD Trucking made derivative works of the Copyrighted Works without authorization from AMC.

174.    Drenth Trucking made derivative works of the Copyrighted Works without authorization from AMC.

175.    KRD Trucking and Drenth Trucking, under the direction of Mr. Drenth, made derivative works of the Copyrighted Works without authorization from AMC.

176.    KRD Trucking and Drenth Trucking, under the direction of Mr. Manzke, made derivative works of the Copyrighted Works without authorization from AMC.

177.    KRD Trucking distributed copies of the Copyrighted Works without authorization from AMC.

178.    Drenth Trucking distributed copies of the Copyrighted Works without authorization from AMC.

179.    KRD Trucking and Drenth Trucking, either by Mr. Drenth directly or under Mr. Drenth's direction, distributed copies of the Copyrighted Works without authorization from AMC.

180.    KRD Trucking and Drenth Trucking, either by Mr. Manzke directly or under Mr. Manzke's direction, distributed copies of the Copyrighted Works without authorization from AMC.

181.    AMC kept the production materials used to manufacture the Manual-Tarp Product in AMC's facilities up until approximately summer 2011.

182.    AMC kept the Initial Machinery and the Additional Machinery in AMC's facilities up until approximately summer 2011.

183.    In or about summer 2011, AMC disposed of the production materials used to manufacture the Manual-Tarp Product.

184.    In or about summer 2011, AMC disposed of the Initial Machinery and the Additional Machinery.

185.    In or about summer 2011, AMC became aware that KRD Trucking manufactured the Infringing Manual-Tarp Product and that KRD Trucking installed the Infringing Manual-Tarp Product on the KRD-Related Trailers.

186.    In or about summer 2011, AMC became aware that Drenth Trucking manufactured the Infringing Manual-Tarp Product and that Drenth Trucking installed the Infringing Manual-Tarp Product on the KRD-Related Trailers.

187.    In or about summer 2011, AMC became aware that KRD Trucking and Drenth Trucking, under the direction of Mr. Drenth, manufactured the Infringing Manual-Tarp Product and installed the Infringing Manual-Tarp Product on the KRD-Related Trailers.

188.    In or about summer 2011, AMC became aware that KRD Trucking and Drenth Trucking, under the direction of Mr. Manzke, manufactured the Infringing Manual-Tarp Product and installed the Infringing Manual-Tarp Product on the KRD-Related Trailers.

189.    Due to KRD Trucking's and Drenth Trucking's manufacturing by themselves of manual-tarp products, KRD Trucking and Drenth Trucking did not request delivery of what remained of the order of the two hundred fifty (250) Manual-Tarp Products.

190.    AMC did not authorize any other person or entity to manufacture the Manual-Tarp Product or the Infringing Manual-Tarp Product.

1

2

3

## **FIRST CAUSE OF ACTION**

## **DIRECT COPYRIGHT INFRINGEMENT UNDER 17 U.S.C. § 501**

## **(AGAINST ALL DEFENDANTS)**

4      191.    AMC incorporates, repeats, and realleges every allegation set forth above.

5      192.    AMC holds the exclusive right to reproduce the Copyrighted Works, pursuant to

6   17 U.S.C. § 106(1).

7      193.    AMC holds the exclusive right to prepare derivative works based upon the

8   Copyrighted Works, pursuant to 17 U.S.C. § 106(2).

9      194.    AMC holds the exclusive right to distribute copies of the Copyrighted Works,

10   pursuant to 17 U.S.C. § 106(3).

11      195.    Defendants, individually and collectively, reproduced the Copyrighted Works in

12   derogation of AMC's exclusive rights under 17 U.S.C. § 106(1).

13      196.    Defendants, individually and collectively, created an unauthorized derivative of

14   the Copyrighted Works in derogation of AMC's exclusive rights under 17 U.S.C. § 106(2).

15      197.    Defendants, individually and collectively, distributed an unauthorized

16   reproduction of the Copyrighted Works in derogation of AMC's exclusive rights under 17 U.S.C.

17   § 106(3).

18      198.    Defendants, individually and collectively, willfully engaged in infringement of

19   the Copyrighted Works.

20      199.    AMC has sustained actual damages as a result of Defendants' acts as alleged

21   herein, and Defendants are liable to AMC for such damages pursuant to 17 U.S.C. § 504(a)(1).

22      200.    Defendants have profited as a result of Defendants' acts as alleged herein, and

23   Defendants are liable to AMC for such profits pursuant to 17 U.S.C. § 504(a)(1).

24      201.    Defendants' acts of willful infringement entitle AMC to statutory damages of up

25   to one hundred fifty thousand dollars ($150,000.00) pursuant to 17 U.S.C. § 504(c).

26      202.    AMC has been required to retain an attorney to prosecute this action, and

27   Defendants are liable to AMC for AMC's attorney fees pursuant to 17 U.S.C. § 505.

28

203.    AMC has incurred costs of suit in connection with bringing this action, and Defendants are liable to AMC for those costs of suit pursuant to 17 U.S.C. § 505.

## SECOND CAUSE OF ACTION

## VICARIOUS COPYRIGHT INFRINGEMENT

## (AGAINST ALL DEFENDANTS)

204.    AMC incorporates, repeats, and realleges every allegation set forth above.

205.    Defendants, individually and collectively, profited and continue to profit from infringement of the Copyrighted Works.

206.    Each of the Defendants has the ability to stop or limit infringement by the Defendants with respect to the Copyrighted Works, but each Defendant has declined to meaningfully exercise that ability.

207.    AMC has sustained actual damages as a result of Defendants' acts as alleged herein, and Defendants are liable to AMC for such damages pursuant to 17 U.S.C. § 504(a)(1).

208.    Defendants have profited as a result of Defendants' acts as alleged herein, and Defendants are liable to AMC for such profits pursuant to 17 U.S.C. § 504(a)(1).

209.    AMC has been required to retain an attorney to prosecute this action, and Defendants are liable to AMC for AMC's attorney fees pursuant to 17 U.S.C. § 505.

210.    AMC has incurred costs of suit in connection with bringing this action, and Defendants are liable to AMC for those costs of suit pursuant to 17 U.S.C. § 505.

## THIRD CAUSE OF ACTION

## CONTRIBUTORY COPYRIGHT INFRINGEMENT

## (AGAINST ALL DEFENDANTS)

211.    AMC incorporates, repeats, and realleges every allegation set forth above.

212.    Each of the Defendants intentionally induced and encouraged the other Defendants to engage in infringement of the Copyrighted Works by causing Defendants to reproduce, distribute copies of, and prepare derivative works based on the Copyrighted Works, in derogation of AMC's exclusive rights under 17 U.S.C. § 106.

213.    AMC has sustained actual damages as a result of Defendants' acts as alleged herein, and Defendants are liable to AMC for such damages pursuant to 17 U.S.C. § 504(a)(1).

214.    Defendants have profited as a result of Defendants' acts as alleged herein, and Defendants are liable to AMC for such profits pursuant to 17 U.S.C. § 504(a)(1).

215.    AMC has been required to retain an attorney to prosecute this action, and Defendants are liable to AMC for AMC's attorney fees pursuant to 17 U.S.C. § 505.

216.    AMC has incurred costs of suit in connection with bringing this action, and Defendants are liable to AMC for those costs of suit pursuant to 17 U.S.C. § 505.

## FOURTH CAUSE OF ACTION

## MISAPPROPRIATION OF COMMERCIAL PROPERTIES UNDER NEVADA COMMON LAW (AGAINST ALL DEFENDANTS)

217.    AMC incorporates, repeats, and realleges every allegation set forth above.

218.    AMC has invested significant time, effort, and money in developing the AMC Work Product.

219.    The AMC Work Product provided value to AMC.

220.    Defendants' wrongful use of the AMC Work Product, undertaken without authority from AMC, deprived AMC of the commercial value of the AMC Work Product.

221.    AMC has sustained and will continue to sustain damages as a direct and proximate result of Defendants' acts as alleged herein, and Defendants are liable to AMC for such damages.

## FIFTH CAUSE OF ACTION

## CONTRIBUTORY MISAPPROPRIATION OF COMMERCIAL PROPERTIES (AGAINST ALL DEFENDANTS)

222.    AMC incorporates, repeats, and realleges every allegation set forth above.

223.    Each of the Defendants intentionally induced and encouraged the Defendants to engage in misappropriation of the AMC Work Product.

224.    Defendants' wrongful use of the AMC Work Product, undertaken without authority from AMC, deprived AMC of the commercial value of the AMC Work Product.

225.    AMC has sustained and will continue to sustain damages as a direct and proximate result of Defendants' acts as alleged herein, and Defendants are liable to AMC for such damages.

<b><u>SIXTH CAUSE OF ACTION</u></b>

<b><u>INTENTIONAL MISREPRESENTATION</u></b>

<b><u>(AGAINST ALL DEFENDANTS)</u></b>

226.    AMC incorporates, repeats, and realleges every allegation set forth above.

227.    Defendants made the respective East Misrepresentations, the Fleet Expansion Misrepresentations, the Inducement Misrepresentations, the Regulation Misrepresentations, the Substantial Order Misrepresentations, the Florida Misrepresentations, and the Continuous Misrepresentations to AMC (collectively known herein as the "Fraudulent Misrepresentations").

228.    The Fraudulent Misrepresentations were false when made.

229.    Defendants knew or believed that the Fraudulent Misrepresentations were false, or Defendants had an insufficient basis for making the Fraudulent Misrepresentations in relation to Defendants following through with purchasing two hundred fifty (250) Manual-Tarp Products in relation to the Contract.

230.    Defendants intended to induce AMC to rely on the Fraudulent Misrepresentations so that AMC would incur the costs in relation to the Contract.

231.    Defendants intended to induce AMC to rely on the Fraudulent Misrepresentations so that AMC would perform the work associated with the AMC Work Product.

232.    AMC relied on the Fraudulent Misrepresentations as AMC had no reason to believe that Defendants did not intend to engage in a reasonable business transaction.

233.    AMC has sustained actual damages as a result of Defendants' acts as alleged herein, and Defendants are liable to AMC for such damages.

<b><u>SEVENTH CAUSE OF ACTION</u></b>

<b><u>FRAUD IN THE INDUCEMENT</u></b>

<b><u>(AGAINST ALL DEFENDANTS)</u></b>

234.    AMC incorporates, repeats, and realleges every allegation set forth above.

235.   Defendants made the respective Pre-Contract Misrepresentations to AMC.

236.   The Pre-Contract Misrepresentations were false when made.

237.   Defendants knew or believed that the Pre-Contract Misrepresentations were false, or Defendants had an insufficient basis for making the Pre-Contract Misrepresentations in relation to Defendants following through with purchasing two hundred fifty (250) Manual-Tarp Products in relation to the Contract.

238.   Defendants intended to induce AMC to rely on the Pre-Contract Misrepresentations so that AMC would enter into the Contract.

239.   AMC justifiably relied on the Pre-Contract Misrepresentations as AMC had no reason to believe that Defendants did not intend to engage in a reasonable business transaction.

240.   AMC has sustained actual damages as a result of Defendants' acts as alleged herein, and Defendants are liable to AMC for such damages.

## EIGHTH CAUSE OF ACTION

## FRAUDULENT CONCEALMENT

## (AGAINST ALL DEFENDANTS)

241.   AMC incorporates, repeats, and realleges every allegation set forth above.

242.   Defendants, individually and collectively, concealed or suppressed from AMC material facts in relation to the Contract, including, without limitation, the Fraudulent Misrepresentations (the "Concealed Facts").

243.   Defendants were under a duty to disclose the Concealed Facts to AMC based on Defendants' special relationship with AMC.

244.   Defendants intentionally concealed or suppressed the Concealed Facts with the intent to defraud AMC and for the purpose of inducing AMC to invest time and money in relation to the Contract.

245.   AMC was unaware of the Concealed Facts and AMC would have acted differently if AMC had known of the Concealed Facts.

246.   AMC has sustained actual damages as a result of Defendants' acts as alleged herein, and Defendants are liable to AMC for such damages.

## NINTH CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

## (AGAINST ALL DEFENDANTS)

247.   AMC incorporates, repeats, and realleges every allegation set forth above.

248.   Defendants, individually and collectively, had a pecuniary interest in the course of entering into the Contract.

249.   Defendants failed to exercise reasonable care or competence in obtaining or communicating information to AMC regarding Defendants' reluctance to follow through with the terms of the Contract.

250.   The information provided to AMC by Defendants was false when made.

251.   AMC justifiably relied on Defendants' intent and desire to follow through with the terms of the Contract as AMC had no reason to believe that Defendants did not intend to engage in a reasonable business transaction.

252.   AMC has sustained actual damages as a result of Defendants' acts as alleged herein, and Defendants are liable to AMC for such damages.

## TENTH CAUSE OF ACTION

## CIVIL CONSPIRACY

## (AGAINST ALL DEFENDANTS)

253.   AMC incorporates, repeats, and realleges every allegation set forth above.

254.   Defendants agreed to act in concert with each other, and, individually and collectively, intended to accomplish the unlawful objective of committing fraudulent acts against AMC.

255.   Defendants conspired with one another to defraud AMC.

256.   AMC has sustained actual damages as a result of Defendants' acts as alleged herein, and Defendants are liable to AMC for such damages.

**ELEVENTH CAUSE OF ACTION**

**AIDING AND ABETTING**

**(AGAINST ALL DEFENDANTS)**

257.    AMC incorporates, repeats, and realleges every allegation set forth above.

258.    Each of the Defendants substantially assisted or encouraged one another's conduct, through direct communication or conduct in close proximity to each other, in breaching duties owed by Defendants to AMC.

259.    Each of the Defendants was aware of their respective role in promoting the breach of duties owed to AMC.

260.    AMC has sustained actual damages as a result of Defendants' acts as alleged herein, and Defendants are liable to AMC for such damages.

**TWELFTH CAUSE OF ACTION**

**BREACH OF CONTRACT**

**(AGAINST KRD TRUCKING AND DRENTH TRUCKING)**

261.    AMC incorporates, repeats, and realleges every allegation set forth above.

262.    AMC, KRD Trucking, and Drenth Trucking entered into the Contract.

263.    AMC performed or was excused from performing all acts required of AMC pursuant to the Contract.

264.    KRD Trucking and Drenth Trucking breached the Contract by, at a minimum, failing to purchase two hundred fifty (250) Manual-Tarp Products in relation to the Contract.

265.    AMC has sustained actual damages as a result of KRD Trucking's and Drenth Trucking's acts as alleged herein, and KRD Trucking and Drenth Trucking are liable to AMC for such damages.

**THIRTEENTH CAUSE OF ACTION**

**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

**(AGAINST KRD TRUCKING AND DRENTH TRUCKING)**

266.    AMC incorporates, repeats, and realleges every allegation set forth above.

267.    KRD Trucking and Drenth Trucking deliberately contravened the spirit and intention of the Contract by failing to purchase two hundred fifty (250) Manual-Tarp Products and by willfully infringing on the Copyrighted Works.

268.    AMC has sustained actual damages as a result of KRD Trucking's and Drenth Trucking's acts as alleged herein, and KRD Trucking and Drenth Trucking are liable to AMC for such damages.

**FOURTEENTH CAUSE OF ACTION**

**UNJUST ENRICHMENT UNDER NEVADA COMMON LAW**

**(AGAINST ALL DEFENDANTS)**

269.    AMC incorporates, repeats, and realleges every allegation set forth above.

270.    AMC conferred upon Defendants, individually and collectively, a benefit relating to AMC's performance of the Contract.

271.    Defendants appreciated the benefit of AMC's performance of the Contract.

272.    Defendants accepted and retained the benefit of AMC's performance of the Contract to AMC's detriment.

273.    Defendants' appreciation, acceptance and retention of AMC's performance of the Contract caused Defendants to be unjustly enriched.

274.    AMC suffered damages as a direct and proximate result of Defendants' acts, including, without limitation, costs and lost income in relation to the Contract.

275.    It is inequitable for Defendants to retain the benefit of AMC's performance of the Contract without providing sufficient payment to AMC.

276.    AMC is entitled to recover an amount by which Defendants have been unjustly enriched by AMC's performance of the Contract.

277.    Defendants could foresee AMC's request for attorneys' fees in prosecuting Defendants' unjust enrichment, and Defendants are thus liable for AMC's attorneys' fees and costs incurred herein.

**FIFTEENTH CAUSE OF ACTION**

**PROMISSORY ESTOPPEL**

**(AGAINST ALL DEFENDANTS)**

278.     AMC incorporates, repeats, and realleges every allegation set forth above.

279.     Defendants knew that Defendants, individually and collectively, did not intend to follow through with the Contract.

280.     Defendants intended that AMC would act upon the Pre-Contract Misrepresentations.

281.     AMC was unaware of Defendants' true intentions.

282.     AMC relied on the Pre-Contract Misrepresentations to AMC's detriment.

283.     AMC has sustained actual damages as a result of Defendants' acts as alleged herein, and Defendants are liable to AMC for such damages.

**PRAYER FOR RELIEF**

AMC prays for judgment against Defendants as follows:

a.     For compensatory damages as alleged herein;

b.     For statutory damages arising from Defendants' copyright infringement;

c.     For punitive and exemplary damages;

d.     For attorneys' fees and costs of suit incurred herein;

e.     For any other relief this Court may deem proper.

**DEMAND FOR JURY TRIAL**

AMC hereby requests trial by jury on all causes of action set forth in this Complaint.

Respectfully submitted this 27th day of January, 2012.

DICKINSON WRIGHT PLLC

By   /s/ Jonathan Salls

STEVEN A. GIBSON
Nevada Bar No. 6656
JONATHAN M. A. SALLS
Nevada Bar No. 12085
City Center West
7201 West Lake Mead Boulevard, Suite 503
Las Vegas, Nevada 89128